Before you start, I want to thank both of you. I know we had some scheduling problems this week that were fairly formidable, but we appreciate you accommodating us and agreeing to reschedule. So with that, we may proceed. Not a problem. In fact, thank you for the opportunity to do this. I'd just like to begin by introducing myself. I'm Adam Fox. This is my colleague Stacey Yee, and we're here on behalf of Mr. Karapetyan. As the record reflects, there is no dispute in the record that Mr. Karapetyan, from Armenia, was repeatedly, during the 1990s, taken by either military forces or by the police, detained, beaten, interrogated because of his political activities. Let me just ask this. According to his own testimony, most of this happened in Russia, did it not? Well, a great deal in the record does describe events that occurred in Russia, but on at least three occasions in 1992, 1995, and 1996, when he was back in his home of Armenia, he was subjected to precisely that type of State-endorsed or State-authorized interrogation and beating. But what seemed odd to me was that, well, eight to ten times, he gets beaten, goes to Russia, gets beaten, comes back, gets beaten, goes to Russia, gets beaten, come back. He evidently was allowed to move freely. They gave him a visa, and he chose to move there. Does that make a difference in his case? It does not. First of all, we need to look at this in the context, the historical context. When he was growing up in Armenia, it was part of the Soviet Union, part of the Eastern Bloc. And only in the very early 1990s did Armenia become a so-called free state. But even at that time, it was taken over by anti-democratic forces, the very forces that subjected Mr. Karapetyan to the types of beatings and interrogation and detention that he was consistently trying to escape from. However, when he went to Russia, wherever he stayed in Russia, he was subjected to similar types of beatings and interrogation and the like, not necessarily because of his political beliefs, but because of his ethnic background. And it is that treatment in Russia that shows that relocation in Russia was not really an available remedy. In fact, although the immigration judge suggested that relocation was an available remedy and cited the case of Chio in support of that, that case specifically said that you must be given an undisturbed stay in that place where you attempt to relocate. Mr. Karapetyan's stay in the Soviet Union or in Russia during his several trips back there was certainly not undisturbed, anything but. Thank you. Mr. Fox, could you address for me an issue that I don't think either party has really focused upon? But I have a question as to whether we have jurisdiction here because of the late filing of the appellate fee. It may be an issue that has eluded both parties, but I do have some concerns under the regulations as to whether or not the appeal was timely filed. You're talking about for clarification, you're talking about the appeal to the BIA, not the appeal to our court. Correct. Frankly, that is something that I am not aware of. If the court would like, we could probably address that in a letter following this, but that was something that I was not aware of, nor was it raised at any time by opposing counsel. I understand that. Okay. I realize neither side raised it, which is why I asked the question. But go ahead on the merits. I would suggest just sort of as an off-the-cuff remark, if it would make the Court be a little bit more comfortable with the situation, that whatever happened below I don't think would affect this Court's jurisdiction because the BIA certainly exercised its power of review. There's no question that they went ahead and reviewed it. Because you're not prepared on it, I don't want to use up all your time. Okay. Go ahead. You can go back. Very well. Well, the central part of your claim on the merits is what happened in Armenia, not Russia, just to conclude what Judge Nelson was asking about, right? That's correct. All right. The issue of his trips to Russia may bear on that in a certain respect as to the firm resettlement issue, but you're not claiming relief from anything that happened to him in Russia? Absolutely not. Okay. That's correct. We believe that taken together, the cumulative effect of Mr. Karapetchin's experience of being subjected to the beatings, the detention, because of his political activities in Armenia, that certainly gives a great deal of credence and supports fully his claim of a fear of persecution because he had that past persecution. My — the INS would no longer exist, but at the time, the INS did not present any evidence, did not cross-examine Mr. Karapetchin. They left it entirely to the immigration judge to ridicule Mr. Karapetchin, frankly, to demean him, to interrupt him, and to tell him that he simply didn't believe him. And in order to make an adverse credibility finding that is capable of being upheld on appeal, what the immigration judge needed to do was to identify specific cogent reasons that had a legitimate nexus to the heart of the issue here. And he didn't do that. What the immigration judge did is basically point out trivial inconsistencies, inconsistencies that even through his own questioning and certainly through the failure of the INS to question, there was never an opportunity to cure. And those inconsistencies are, for example, that during a period that Mr. Karapetchin said that he was in Russia, he renewed his passport. How could he possibly have done this? There's nothing in the record to suggest that he couldn't have done it, that it's not entirely consistent for him to have been able to do so. Moreover, it doesn't really relate to the very core of Mr. Karapetchin's claim, and that is that he was subjected to the beatings and the detention in Armenia. But isn't the concern, going back to the questioning from Judge Nelson, isn't the concern that I think the IJ wrestled with as well was the fact that he keeps coming back to Armenia, which is where the incidents of persecution occurred, but he lived for a substantial period of time elsewhere in Russia. And there is a recognized doctrine in immigration case law that indicates that if you can relocate to another part of the country to avoid the persecution, you may not have a legitimate basis for asylum. Isn't that what the IJ was talking about? That's certainly not what the IJ said. I suppose one could try and read beyond the IJ's own explanation and rationale. What do you make of his notation that he lived for eight out of 12 years in Russia without incident? I think that that goes precisely to the issue that the IJ was suggesting, that relocation was a viable option, and relocation in Russia, and therefore if relocation is a viable option in a third country, that is not the United States, not Armenia, then he could be deported. But in fact, as I said a few moments ago, the Chio case does not support that view because the relocation has to be undisturbed. The Andrasian case does not support that view because in that very case, you were dealing with an Azerbaijani citizen who tried to relocate in Armenia, but in fact was told to get out of the country. And that is precisely what happened to Mr. Karapetyan here. I would like to reserve some time for rebuttal. So unless there are any other questions at this point. Roberts. Thank you, counsel. Thank you. Good morning, Your Honors. My name is Patricia Corrales-Dayeda, and I represent the Respondent in this case. Let me begin by addressing the question that Your Honor asked about the Petitioner moving from Armenia to Russia, to Armenia to Russia. As the Court pointed out, the immigration judge did find in the record that the Petitioner in this case spent eight years out of the last ten years in Russia. And during the times that he was in Russia, the Petitioner himself in the record says that the only the times that he left Russia were because his neighbors weren't being nice to him or because there was some ethnical issues involved, but there was no suggestion at all that he wasn't freely allowed to stay in Russia or that he wasn't allowed to live there without disturbance. In fact, the record of evidence shows that the Petitioner in this case advised the immigration judge that at one point he did get legal residence in Russia. So the immigration judge, noting that, found it very, as the Court pointed out, very unsettling how he could possibly claim persecution in Armenia. More in fact, I think there might be two issues, and maybe you can take them in turn. Certainly, Your Honor. One is the issue addressed by the Petitioner saying that the set of circumstances which you've just described goes to where he could be removed to, which country he could be removed to, and that would be relevant to whether or not he could be removed to Russia where he could live undisturbed. That's one set. The second is the doctrine that you can live somewhere else in the country undisturbed, but I'm not aware of any case that would extend that doctrine to third countries. Do you see what I'm saying? There are two different issues, and maybe you can address them both in any manner that you choose, but it seems to me that there are two distinct considerations. Well, Petitioner's counsel talked about the GEO case, and in that case, if the Court remembers, the question was whether the Petitioner in that matter, in that particular case, could relocate. I think in this matter, in this case before the Court, the immigration judge struggled with that issue. The Petitioner himself, Mr. Karpichyan, indicated that of the ten years that he allegedly was living in Armenia, eight of those ten years were in Russia. He had at no point really described any basis for not being able to live there. Didn't his last occasion, he was expelled from Russia? He indicated that he got into a, excuse me, he was beaten, and he went to a hospital because of his injuries, and that the hospital was required to report the incident, and because he didn't want the hospital to report the incident, he left. No, I think that would be the last occasion. The second to last occasion, he was expelled, and then he sneaked back into Russia and then didn't seek medical care because he was afraid he would be reported and expelled again or taken into custody. Am I characterizing the record right? I think the Court is correct in that. Okay. I mean, it was difficult to discern the fact of what times these incidents happened in Russia. Right. What do we make of the fact that he was expelled? I mean, he goes back and forth a number of times. The second to last time, he gets expelled from Russia. What conclusion are we to draw on that? I don't think we can draw any conclusion because it wasn't really explained on the record as to why he was expelled or the nature of his expulsion, excuse me, or whether or not in this case Petitioner can be believed as to, in fact, whether, in fact, he was expelled from Russia. And so I don't think we can really speculate as to the basis for the expulsion if it even occurred, Your Honor. But we certainly couldn't assume there was firm resettlement in Russia. That was suggested earlier. Right. Your Honor, if I could address that. I do think there is – Now, here's what he says. He says, my stay – and I can't pronounce the name. So my stay in Russia was very short. I was detained by the special police force and expelled to Armenia. That's what he says about his second to last. Then I decided to make my last attempt to settle in Russia. I fled to St. Petersburg. I spent one year as an illegal refugee. I shared a tiny apartment with two other Armenian political refugees. Took odd jobs, goes on to say. And then he was beaten up. He attempted to run away. He lost consciousness. When he woke up, he found himself in the mud. He reached the apartment. The doctor told him it was a physical attack. Had to inform the police. It meant for me a new expulsion. I decided not to take chances and went to Armenia. So if we accept that testimony as credible, why can we draw the conclusion that he can now go back to Russia? Why can we draw the conclusion that he cannot go back to Russia? That he can go to Russia without being expelled. Well, Your Honor, he himself on the record stated that at one point during his eight years living in Russia, he was granted legal residence in Russia. Right, that's true. He was allowed to work in Russia. He was allowed to live in Russia. There's no indication on the record that he wouldn't be able to live comfortably, undisturbed in Russia. Now, I understand that the court just pointed out the record where the petitioner in this case indicated that he was expelled from Russia. But that is, in fact, if the petitioner is held to be credible in this case. The immigration judge made an adverse credibility finding in this matter, and he did have specific and cogent reasons for that finding. The finding was not based on conjecture or unsubstantiated, you know, findings by the immigration judge. It was based on the record and the evidence before the judge. Excuse me. It appeared to me that there were two reasons that the IJ gave for the adverse credibility finding. The first was that he felt the existence or holding of the passport was inconsistent with the testimony. And the second is he disputed the country conditions described by the petitioner. Are those the two? Actually, it was another basis. And the other basis being the fact that the petitioner in this case made unsupported statements that if he were to return to Armenia that the police would take him into custody and that he would be beaten. Well, that's a bit. He was pretty beaten. Right. But he indicated that, you know, because the Armenian government had not really changed and he had no support for that position, that he would immediately upon entering Armenia be taken by the police. Okay. Well, let's take them in turn. And the first one, the passport, I didn't see in the record that that was identified to the petitioner as a problem. In other words, the IJ didn't say, I'm concerned about the existence of this passport. It seems to discredit your testimony. Do you have an explanation for it? Is that a fair characterization of what happened? I mean, he didn't ask that, did he? Your Honor, did he specifically ask the petitioner? You know, right. You say you were in Russia during this time, but your Armenian passport has been revalidated. How can that be? Can you explain the inconsistencies?  Did he specifically request that the petitioner explain that inconsistency? The record shows that he didn't. Okay. But unfortunately, Your Honor, and I understand that in Kumara, Judge Reinhart indicated that the immigration judge should at least allow a petitioner to explain a discrepancy. But I think in that case, Judge, the dissenting colleague was precisely on point. That has never been the position of this Court, where an immigration judge has to give notice. The board gave the immigration judge gave him notice at the end of his ruling that his credibility was at issue. The board gave him notice that his credibility at issue. To ask the immigration judge to specifically ask him to explain discrepancy I don't think is really the basis of this, you know, of the law or required. No. I think the only, I think the point of that is that the petitioner ought to have a fair opportunity to address concerns that aren't readily apparent. In this case, what the opposing counsel argues is that, look, that's not inconsistent. Holding a passport isn't consistent with living in Russia. But that's, again, speculation on Petitioner's counsel's part. Well, why is it any different than speculation on the IJ's part, if it's not addressed in the record one way or the other? I'm just asking.  the immigration judge is the person and is the best person in terms of determining with the facts that come before him. He's the best fact, he's in the best position to be the neutral fact finder in this case. And I don't believe the immigration judge inserted any of his own speculation or conjecture as to the basis of Petitioner being permitted or being, or having a passport that had an Armenian revalidation stamp on it when he claimed to be in Russia. I think that just went to the immigration judge's, if you will, finding that there's inconsistencies in Petitioner's testimony as to the time he spent in Armenia and the time that he allegedly spent in Russia. Assuming all that to be true, why does this particular inconsistency go to the heart of the claim? The heart of the claim is that when he was in Armenia, that he was beaten on three occasions and for expressing pro-Western sentiments. If that's really the heart of the claim, the fact that he was spending time in Russia or what time he spent in Russia is sort of beside the point, isn't it? Well, it is and it isn't, Your Honor. I think it goes to the heart of the claim because if he's claiming that he was in Armenia at a time when he was actually in Russia, then he couldn't have been beaten, could he? So that presents a problem as to the time sequence that the Petitioner is seeking the immigration judge in this Court to believe. So there's no way. Excuse me. There's no discrepancy in the fact that he was beaten in Armenia at some time. That is correct. And the immigration judge even said that even if I believe you, in this case that I believe that you were beaten, I don't believe that the type of harm that the Petitioner suffered rises to the level of a past persecution or a well-founded future persecution. Let me just ask him, why isn't this the same as Mamouzian case, upon which Petitioner relies heavily? How is this case distinguishable from Mamouzian? Well, I think it's distinguishable in this case, Your Honor, because the Petitioner and I don't think the record of evidence is clear on this point, but the Petitioner stated in his own direct testimony from his counsel that he was beaten by the military and many times the beatings were not necessarily because of his political activities. In fact, at one point the Petitioner said that he was deemed a traitor because he had deserted the military or the army. So there's no nexus, if you will, between the beatings that Petitioner claims he received and his political involvement in this anti-democratic party, excuse me, this pro-democratic party in Armenia. So I believe that is the distinguishing factor. There's no nexus between his basis for which he's seeking asylum and the basis of the beatings. Any further questions from the panel? Anything else you want to sum up with? No, Your Honor. I believe the record of evidence, again, it does show that there's substantial evidence for the immigration judge's findings in this case, and we would just ask the Court to find one of those same ways. Thank you. Thank you very much. You have amendment 30 for rebuttal. Thank you, Your Honor. Let me pick up where counsel just left off. The key issue here really is that for this Court to affirm the BIA's and the IJ's finding and determination, there must be substantial evidence in the record in order to support the IJ's decision. And what we've heard counsel say here today, as well as in their brief, is that in some places the record is unclear. In some places there are omissions in the record. But it's quite clear from the Bondari case that the mere omission of details is insufficient to uphold an adverse credibility finding. It's quite simply put, a gap in the record is not substantial evidence in the record, and that's what the INS and now the CIS really needs in order to be able to obtain an affirmance. Instead, what we have, this is a case where I said at the very beginning, clear evidence in the record presented by Mr. Karapatchian that is undisputed in the record, that he was subjected to beatings and detention in Armenia on several different occasions over a decade. He ran away. He was forced to come back. He ran away. He may have come back by choice because of other reasons, maybe not being forced. But clearly, relocation in Russia was not an option, certainly after he was ordered to return to Armenia. And being in Armenia and expressing his political views and being detained and beaten, that also is not an option. That is persecution. The only thing in the record that contradicts that at all is the IJ's adverse credibility finding. But that adverse credibility finding is not supported by the specific and cogent reasons that bear a legitimate nexus to the heart of the claim. And for that reason, reversal is warranted. Thank you, Counsel. I want to thank both of you for your arguments, and I know that you're taking this case pro bono. We appreciate it. It's very helpful. And I know you've traveled from D.C. as well, and we appreciate the time. I actually know. You're local? That's true. I'm local. Well, we still appreciate the time. They call me on TV. Well, our hats are off to you for quick preparation on it. Thanks again.
judges: D.W. Nelson, Thomas, Tallman